UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

SHARON KEMNITZ,                          Civ. No. 12-285 (SRN/LIB)
                     Plaintiff,

v.                                       **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                     Defendant.

Sharon Kemnitz (Plaintiff) seeks judicial review of the decision of the Commissioner of

Social Security ("Commissioner" or "Defendant") denying her application for disability

insurance benefits. The matter was referred to the undersigned United States Magistrate Judge

for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court

has jurisdiction over the claims pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Both parties

submitted motions for summary judgment. (Pl.'s Mot. Summ. J. [Docket No. 6]; Def.'s Mot.

Summ. J. [Docket No. 9]). For the reasons set forth below, the Court recommends that

Plaintiff's motion for summary judgment be GRANTED, and Defendant's motion for summary

judgment be DENIED.

I.      **BACKGROUND**

        A. **Procedural History**

        In September 2008 Plaintiff filed an application for Social Security Disability and SSI

Disability benefits, alleging that her disability began on January 22, 2003. (Tr. 110-19).[1] The

Commissioner denied the claims on October 29, 2008. (Tr. 57-61). Subsequently, Plaintiff filed

---

[1] Throughout this Report and Recommendation, the Court refers to the administrative record [Docket No. 5] for the
present case by the abbreviation "Tr."

1

a Request for Reconsideration, and on January 26, 2009, the Commissioner affirmed his earlier decision to deny the claims. (Tr. 67-69). Pursuant to Plaintiff's Request for Hearing by Administrative Law Judge (ALJ), Larry Meuwissen conducted a hearing on August 23, 2010. (Tr. 28-52). After the hearing, the ALJ issued an opinion, (Tr. 14-27), finding that Plaintiff had been disabled since May 19, 2010, but that she was not eligible for Social Security Disability benefits because her disability did not commence prior to the expiration of her date last insured of December 31, 2008. (Tr. 18, 25-26). Plaintiff sought review of the decision with the Appeals Council, but on January 4, 2012, it denied review. (Tr. 1-4). Thus, the ALJ's decision became the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## B. Factual History

Plaintiff is a 51-year-old woman with a tenth-grade education and training as a nursing assistant. (Tr. 110, 34). Since 2000 Plaintiff has worked as a sales clerk, a nursing assistant, and a greenhouse worker. (Tr. 152).[2] However, after experiencing severe chest pains Plaintiff was airlifted to North Memorial Medical Center in Robbinsdale, Minnesota, where she underwent surgery on January 22, 2003, to repair an "acute Type A aortic dissection." (Tr. 266).[3] She was discharged from the hospital three days later. Id.

At the hearing, Plaintiff testified[4] that she experiences pain from "sitting too long, standing too long, walking too much." (Tr. 39). Plaintiff has a car, and tries to drive somewhere every day to get out of the house, but that she rarely travels far. (Tr. 33-34, 37). Plaintiff has two horses and a garden, but one of her daughters and her husband care for both. (Tr. 36-37).

---

[2] Plaintiff also worked as a drink server at a casino from April 2008 to August 2008, but the ALJ concluded that this was "an unsuccessful work activity pursuant to 20 C.F.R. 404.1574(c), 404.1575(d), 416.94(c) and 416.975(d)." (Tr. 20).
[3] Plaintiff's medical history is recounted in greater detail in Part I.C, infra.
[4] The facts reported in this paragraph are based on Plaintiff's testimony at the August 23, 2010, hearing before the ALJ. (See Tr. 14-27).

Plaintiff's back pain limits her ability to perform household chores.  (Tr. 39).  Plaintiff cannot sit or stand for more than approximately half-an-hour at a time or her legs go numb, a condition she says began after her aneurysm developed and has gotten progressively worse.  (Tr. 40-41).

### C.  Medical Evidence in the Record

On January 21, 2003, plaintiff went to the emergency room at St. Joseph's Hospital in Brainerd, Minnesota, experiencing "severe chest pain."  (Tr. 347-48).  A CT scan revealed an "acute Type A aortic dissection," or an aortic aneurysm, and Plaintiff was transported via air ambulance to North Memorial.  Id.  There on January 22, 2003, doctors surgically repaired the aneurysm.  (Tr. 266-67, 270-71).  Following surgery, Plaintiff's aortic root measured 4.2 cm. (Tr. 265).  During follow-up medical visits in July 2003, Plaintiff reported "no problems" since her surgery.  (Tr. 288).  An MRI performed at the time showed Plaintiff's abdominal aorta had a maximum diameter of 2.6 cm.  (Tr. 276).[5]  Cardiologist Dr. Richard Nelson (Dr. Nelson) described Plaintiff as "stable," but also opined that sometime in the future she would "have to limit her activity and that any kind of isometric exercise, such as heavy lifting or straining that increases blood pressure is probably not a very good idea."  (Tr. 326).

A CT scan on May 23, 2005, showed Plaintiff's aorta measured between 3 cm and 4 cm in diameter, with an aortic root measurement of 3.6 cm, which was described as being "near the upper limits of normal."  (Tr. 453-54).  Shortly thereafter, Plaintiff asked both her primary care physician and a cardiac specialist for clearance to lift fifty pounds so that she could return to work, but both refused to provide such clearance.  (Tr. 385, 496).  Subsequently, Dr. Les. E. Riess (Dr. Riess), Plaintiff's primary care physician, wrote on August 11, 2005, that Plaintiff was "unable to work at this time."  (Tr. 504).  A CT scan on March 2, 2006, showed no change in

---

[5] The notes of Dr. S. Gustaf Fisker (Dr. Fisker) report that a reviewing cardiologist had said that Plaintiff was "doing pretty well."  (Tr. 287).

Plaintiff's condition in the past year. (Tr. 410). On May 22, 2006, Dr. Riess wrote that Plaintiff remained "unable to work . . . unless she has a work restrictions" [sic], adding that Plaintiff "could be considered for a completely sedentary job," but that she remained "susceptible to catastrophic changes in her atrial system" and that "any strain at all could be life-threatening." (Tr. 501). On July 13, 2006, Plaintiff underwent an echocardiogram that showed her aortic root measured 3.4 cm. (Tr. 402).

Further testing on February 8, 2007, had mixed results. An echocardiogram showed a slight reduction in the size of Plaintiff's aortic root to 2.9 cm (Tr. 361, 398). However, notes from a CT scan state that Plaintiff's "aortic root is dilated, measuring 4.8 cm in diameter, increased slightly in size since the previous study when it measured about 4.2 cm in diameter." (Tr. 363, 401). A CT scan of Plaintiff's chest on August 29, 2008, showed her aorta to be approximately 5 cm at its widest. (Tr. 367, 371).[6] The report from an ultrasound taken on September 3, 2008, indicates "[i]ncreasing diameter of the aorta, presently measuring 3.2 centimeters in diameter." (Tr. 375). However, subsequent review by a consulting cardiac specialist and a radiologist concluded that

> the ultrasound is not an adequate test, it is an inferior test for assessing the aorta compared to the CT that she had done and, in fact, the CT does not show any change in size compared to her previous CTs which would lead to the conclusion that her aortic dissection is stable.

(Tr. 415, 490).

On October 28, 2008, the non-examining state agency reviewer, Robert Schultz, opined that Plaintiff was capable of performing some light work. (Tr. 424-31). On January 26, 2009, a second reviewer, Dr. Gregory H. Salmi, affirmed that opinion. (Tr. 468-70).

---

[6] An addendum to this report states that the "[a]ortic root measurement based on coronal sections is 4.2 [cm] as it was in the prior report." (Tr. 372).

On December 9, 2008, Dr. Michael King (Dr. King) wrote to Dr. Riess that "apparently [Plaintiff's] aortic root is potentially increasing in size from 4.2 [cm] to now 4.8 [cm]," and recommended performing a CT scan annually to make sure that the aortic root does not exceed 5.5 cm. (Tr. 477). On January 6, 2009, Dr. Riess informed Plaintiff that she could return to work part time. (Tr. 478). Plaintiff underwent both a CT scan and ultrasound on April 28, 2009. The ultrasound showed Plaintiff's aorta measured 2.7 cm. (Tr. 481). The report from the CT scan does not list a measurement, but reports Plaintiff's "thoracic aortic dissection" to be unchanged from since the August 29, 2008, measurement. (Tr. 481, 500). The August 29, 2008, CT scan showed Plaintiff's dissection to be 5 cm. (Tr. 367, 371).

After the ALJ's decision, Dr. King wrote a letter to Plaintiff's counsel, summarizing the medical records and opining that Plaintiff's "aortic root has continued to increase over the last several years . . . . It certainly appears from the CT scan reports that I have reviewed that there has been an appreciable increase in the size of the ascending aortic root since my initial repair in January 2003." (Tr. 508).[7]

### D. Statements and Hearing Testimony

As reported in Part I.B, supra, Plaintiff testified at her hearing that she has been limited in her activities since she underwent surgery in 2003. Her statements at the hearing generally are consistent with a function report she filled out on September 29, 2008, in which she reported:

- Before her surgery, she worked as a nursing assistant and enjoyed outdoor activities such as hunting and camping.

- Since her surgery she has been able to cook light meals, but has been unable to cook larger meals such as holiday turkey.

---

[7] Plaintiff submitted Dr. King's April 18, 2011, letter to the Appeals Council, which accepted it as part of the administrative record. (Tr. 4).

- Since her surgery, household chores take much longer; for example, it might take two days to clean the kitchen.

(Tr. 172-73). Plaintiff describes similar conditions in her Disability Report—Appeal, in which she states that she is no longer able to do the things she used to do and that she has to nap a couple of times every day. (Tr. 195).

A vocational expert, Mr. Hogenson,[8] testified at the hearing that Plaintiff likely could not perform the jobs she had previously held, but that there were other jobs that she could perform. (Tr. 47-48). He also testified, however, that if Plaintiff were unable to sit for long periods, then even those sedentary jobs that he described might be beyond her capabilities. (Tr. 49-50).

### E. Administrative Decisions

In his September 27, 2010, decision, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2008. (Tr. 20). The ALJ then considered Social Security Listing 4.10 (Listing 4.10), concerning aortal aneurysms, and concluded that "the severity of the [Plaintiff]'s circulatory disease does not meet or equal this listing." (Tr. 21). In support, the ALJ cited evidence that Plaintiff's dissection has not shown an increase in size. Id. The ALJ also noted that Plaintiff had shown neither persistence of chest pain, nor compression of one or more of the branches of the aorta that feed major organs. Id. Consequently, the ALJ concluded that, prior to May 19, 2010, there existed a significant number of jobs that Plaintiff could perform, and Plaintiff was not entitled to Social Security Disability benefits. (Tr. 25-26). However, upon Plaintiff's fiftieth birthday on May 19, 2010, her age category changed, rendering her disabled and eligible for SSI Disability benefits since that date. (Tr. 27).

---

[8] The hearing transcript reports that spelling as "phonetic," and does not report Mr. Hogenson's first name.

The Appeals Council on January 4, 2012, denied Plaintiff's Request for Review, stating that Dr. King's April 18, 2011, letter neither "provide[d] a basis for establishing more restrictive functional limitations than those found by the [ALJ]," nor "provide[d] a basis for changing the [ALJ]'s decision." (Tr. 2).

## II.     STANDARD OF REVIEW

Congress imposed standards for determining whether a claimant is entitled to Social Security disability benefits. "Disability" means "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be eligible for benefits, an individual's impairments must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Judicial review of the Commissioner's decision to deny disability benefits is constrained to a determination of whether the decision is supported by substantial evidence on the record as a whole. Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005). Substantial evidence means more than a scintilla, but less than a preponderance. Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009). The "substantial evidence on the record as a whole" standard, however, is "a more scrutinizing analysis," which requires "more than a mere search of the record for evidence supporting the [Commissioner]'s findings." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (brackets in original, internal quotations and citations omitted). Rather, when evaluating whether there is substantial evidence on the record as a whole, the court "must take into account

whatever in the record fairly detracts from its weight." Id. (quoting Universal Camera Corp. v. National Labor Relations Bd., 340 U.S. 474, 488 (1951)).

When reviewing the record for substantial evidence, the Court may not reverse the Commissioner's decision simply because substantial evidence exists to support the opposite conclusion. Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984). Moreover, the Court may not substitute its own judgment or findings of fact for those of the ALJ. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Trboyevich v. Astrue, Civ. No. 11-2911 (SRN/AJB), 2012 U.S. Dist. LEXIS 140452, at *25 (D. Minn. Sept. 12, 2012) (Boylan, M.J.) (quoting Gavin, 811 F.2d at 1199)). After balancing the evidence, "if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the Court] must affirm the decision." Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). Thus, the Court will not reverse the ALJ's decision "so long as the ALJ's decision falls within the 'available zone of choice.'" Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 20008) (quoting Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006)).[9]

## III.    DISCUSSION

Plaintiff argues that the ALJ's decision "cannot be sustained, because of errors of law." (Pl.'s Mem. Supp. Mot. Summ. J. [Docket No. 7], at 20). First, Plaintiff argues that the ALJ misstated the requirements of Social Security Listing 4.10. (Id. at 20-22). Second, Plaintiff argues that the ALJ and Appeals Council failed to fully and fairly develop the record by failing to obtain evidence from a medical expert who had reviewed the record as a whole. (Id. at 22-

[9] The "zone of choice" is that area where the evidence "allows for the possibility of drawing two inconsistent conclusions . . . within which the Secretary may decide to grant or deny benefits without be subject to reversal on appeal." Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).

23).  Third, Plaintiff argues that the ALJ and Appeals Council failed to give adequate weight to the opinions of Plaintiff's treating physicians.  (Id. at 24-25).  Finally, Plaintiff argues that evidence on the record as a whole shows that Plaintiff met the requirements of Listing 4.10.  (Id. at 25-26).

### A.  Whether the ALJ Misstated the Requirements of Listing 4.10.

Plaintiff argues that the ALJ misstated the requirements of 4.00H6 (and, by extension, of Listing 4.10) by implying that the listing requires that chest pain and enlargement of the dissection must occur in tandem.  (Pl.'s Mem. Supp. Mot. Summ. J. [Docket No. 7], at 20-22).  First, Plaintiff objects to the ALJ's statement that her dissection did not meet the requirements of Listing 4.10 "because the evidence of record does not document a persistence of chest pain ***along with*** a progression of the dissection; the evidence, rather, shows the disease to be stable."  (Tr. 21 (emphasis added)).  Second, Plaintiff objects to the ALJ's statement that, after an initial enlargement, there is no evidence that her aneurysm increased in size after December 9, 2008.  (Tr. 21-22).

Listing 4.10 provides:

4.10.  Aneurysm of aorta or major branches, due to any cause (e.g., atherosclerosis, cystic medial necrosis, Marfan syndrome, trauma), demonstrated by appropriate medically acceptable imaging, with dissection not controlled by prescribed treatment (see 4.00H6).

20 C.F.R. Part 404, Subpart P, App'x 1, Listing 4.10, available at

http://www.law.cornell.edu/cfr/text/20/404/subpart-P/appendix-1.  Listing 4.10 refers to 4.00H6, which appears in the introduction to the section on the cardiovascular system, and states:

6. *When does an aneurysm have "dissection not controlled by prescribed treatment," as required under 4.10?*  An aneurysm (or bulge in the aorta or one of its major branches) is *dissecting* when the inner lining of the artery begins to separate from the arterial wall.  We consider the dissection not controlled when you have persistence of chest pain due to progression of the dissection, an

increase in the size of the aneurysm, or compression of one or more branches of the aorta supplying the heart, kidneys, brain, or other organs. An aneurysm with dissection can cause heart failure, renal (kidney) failure, or neurological complications. If you have an aneurysm that does not meet the requirements of 4.10 and you have one or more of these associated conditions, we will evaluate the condition(s) using the appropriate listing.

20 C.F.R. Part 404, Subpart P, App'x 1, Listing 4.10 (italics in original), <u>available at</u>

http://www.law.cornell.edu/cfr/text/20/404/subpart-P/appendix-1.

The ALJ does appear to have misstated the requirements of Listing 4.10 and 4.00H6, which clearly require only one of the three stated conditions (persistence of pain, an increase in size, or compression of branches supplying major organs). In his finding that "the evidence of record does not document a persistence of chest pain *along with* a progression of the dissection," the ALJ at the very least *implies* that the two conditions must occur together.

Even more troubling is the ALJ's statement that "***[f]ollowing Dr. Michael Kings' [sic] December 9, 2008 note regarding enlargement of the dissection***, evidence has not shown an increase in the size of the [Plaintiff]'s aneurysm." (Tr. 21 (emphasis added)). Here, the ALJ appears to acknowledge that there has been an increase in the size of Plaintiff's aneurysm, but that the listing is not met because her aneurysm has not *continued* to increase in size. That is not the standard established by 4.00H6, which states only that "the dissection [is] not controlled when you have . . . an increase in the size of the aneurysm."

The ALJ misstated and misapplied Listing 4.10.

**B. Whether the ALJ and Appeals Council Did Erred by Failing to Obtain Evidence from a Medical Expert who Reviewed the Record as a Whole.**

Plaintiff argues that the ALJ was not himself competent to evaluate Plaintiff's cardiac condition and should have obtained an independent medical review of the record. (Pl.'s Mem. Supp. Mot. Summ. J. [Docket No. 7], at 22-23). Plaintiff further argues that the state agency

reviewers did not make findings specific to Listing 4.10, and that the objective medical evidence demonstrated that the requirements of Listing 4.10 were met. Id. at 23. Under such conditions, Plaintiff argues, the ALJ was required to obtain an opinion from a medical expert. Id. (citing Soc. Sec. Ruling (SSR) 96-6p, 1996 WL 374180 (July 2, 1996); quoting Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992) ("It is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision" (internal quotation and citations omitted)).

Defendant argues that no additional medical evidence was required. (Def.'s Mem. Supp. Mot. Summ. J. [Docket No. 10], at 9-11). In particular, Defendant argues that the state agency reviewers' electronic signatures on the Disability Determination and Transmittal (DDT) Forms demonstrate that the reviewers considered whether Plaintiff met the requirements of Listing 4.10. Id. at 10 (citing SSR 96-6p, 1996 WL 374180, at *1). Additionally, Defendant argues that the state agency reviewers can be presumed to have concluded that Plaintiff's condition neither met nor equaled any listing because those reviewers proceeded to issue residual functional capacity (RFC) assessments. Id. at 9-10 (quoting Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 978 n.2 (8th Cir. 2003) ("[i]f his condition had met the equivalency requirement, there would have been no need to measure his RFC")). Defendant further argues that the ALJ's consideration of the state agency reviewers' opinions constituted sufficient expert review. Id. at 10 (citing Tr. 24).

Although both parties cite SSR 96-6p in support of their arguments, Defendant's argument is the more persuasive. SSR 96-6p "does not require that the ALJ *appoint* an expert on the issue of equivalency. Rather [it] affirms that the record must *include* opinion evidence on the issue of equivalence." Smith v. Astrue, No. 09-2996 (RHK/AJB), 2011 U.S. Dist. LEXIS 30914, at *35 (D. Minn. Feb. 1, 2011) (Boylan, M.J.), adopted by 2011 U.S. Dist. LEXIS 25781

(D. Minn. Mar. 1, 2011) (Kyle, J.). Although SSR-96p makes clear that neither the ALJ nor the Appeals Council is bound by a state agency reviewer's opinion, it also makes clear such an opinion "must be received into the record as expert opinion evidence and given appropriate weight." 1996 WL 374180, at *3. In the present case, the ALJ did "give some weight to the opinions of the State agency medical consultants," and noted that "their opinions are generally consistent with the overall finding that the claimant is not disabled." (Tr. 24). Additionally, there is no dispute that the reviewers signed DDT forms on which they opined that Plaintiff was capable of performing some light work. (Tr. 424-31, 468-70). SSR 96-6p provides that "[t]he signature of a State agency medical . . . consultant on [a DDT form] . . . ensures that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." 1996 WL 374180, at *3.[10] Although the state agency reviewers do not specifically address Listing 4.10, the Eighth Circuit has held that when a state agency reviewer performs an RFC assessment, it is implicit that the reviewer considered the appropriate listing, "[b]ecause no assessment of RFC would have been necessary if the physician had found that the claimant's condition was equivalent to a listed impairment . . . ." Smith, 2011 U.S. Dist. LEXIS 30914, at *35 (quoting Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir. 2010).

The ALJ and the Appeals Council are olny required to obtain an updated medical opinion in one of two circumstances:

- When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or

---

[10] See also Id. ("When an administrative law judge or the Appeals Council finds that an individual's impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion into the record may be satisfied by any of the foregoing documents signed by a State agency medical . . . consultant.").

- When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical . . . consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments

SSR 96-6p, 1996 WL 374180, at *4. There is no evidence in the record to suggest that either the ALJ or the Appeals Council determined "that a judgment of equivalence may be reasonable." Id. Thus, the first condition is not met. Plaintiff argues that the second condition was met when Plaintiff supplemented the record before the Appeals Council by providing Dr. King's letter of April 18, 2011. (Pl.'s Mem. Supp. Mot. Summ. J. [Docket No. 7], at 23). However, the Appeals Council expressly stated that it had reviewed the letter "and concluded that the information contained in this letter does not provide a basis for establishing more restrictive functional limitations than those found by the [ALJ]." (Tr. 1-2). Thus, the second condition is not met.

Because the ALJ properly considered the opinions of the state agency reviewers, and because neither of the conditions under which the ALJ and the Appeals Council are required to seek an updated opinion were met, the Court concludes that the ALJ and the Appeals Council did not err by failing to obtain an updated medical opinion.

## C. Whether the ALJ Failed to Give Appropriate Weight to the Opinions of Treating Physicians.

Plaintiff argues that her treating physicians, Dr. King and Dr. Riess, both opined that her aneurysm had increased in size, and that the ALJ failed to give "controlling weight" to that opinion. (Pl.'s Mem. Supp. Mot. Summ. J. [Docket No. 7], at 24-25). Plaintiff asserts that both Dr. King and Dr. Riess documented an increase in the size of Plaintiff's aneurysm, which should be controlling on question of whether her dissection was under control. (Id.; Pl.'s Reply Supp. Mot. Summ. J. [Docket No. 11], at 8).

Defendant argues that "[n]either doctor offered an opinion as to whether Plaintiff's impairments met or equaled a listing." (Def.'s Mem. Supp. Mot. Summ. J. [Docket No. 10], at 11-12). However, this misses the point. Plaintiff does not argue that Dr. King and Dr. Riess opined about whether Plaintiff met Listing 4.10. Rather, Plaintiff argues that Dr. King and Dr. Riess offered opinions, supported by and consistent with objective medical tests, concerning the underlying question of medical fact, i.e., whether Plaintiff's aneurysm had increased in size. Plaintiff argues the objective increase in the size of her aortic aneurysm met Listing 4.10.

The regulations governing how an ALJ is to weigh a treating physician's opinions differentiate between *medical* opinions and other opinions. A treating physician's opinion "on the issue(s) of the nature and severity" of an impairment is given controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case. 20 C.F.R. § 404.1527(c)(2).[11] On the other hand, certain decisions are legal questions reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Consequently, a *non-medical* opinion, such as a treating physician's opinion whether a patient is disabled, or whether the patient meets the requirements of an impairment in the listings, must be considered but is not given controlling weight. 20 C.F.R. § 404.1527(d)(1)-(2).[12]

---

[11] See also SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996) ("Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources; Dolph v. Barhart, 308 F.3d 876, 878 (8th Cir. 2002) ("[A] treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" (internal quotations and citation omitted)).

[12] See also SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996):
   [S]ome issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination of a decision of disability. The following are examples of such issues:
      1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
      . . .
      5. Whether an individual is "disabled" under the Act.

In the present case, the ALJ acknowledges that "Dr. Michael King, the claimant's cardiovascular surgeon, indicated in a December 9, 2008 letter, that the claimant had some concern with a potentially enlarging aortic root *that has increased in size from 4.2 cm to 4.8 cm*." (Tr. 21 (citing Tr. 477) (emphasis added)). Dr. King's opinion was consistent with that of Dr. Riess, Plaintiff's primary care physician. (Tr. 479 ("Her aneurysm has slightly increased.")). Moreover, these opinions are consistent with CT scans that show her aneurysm measured 4.2 cm after her surgery in January 2003 (Tr. 265), 4.0 cm in May 2005 (Tr. 454), 4.8 cm in February 2007 (Tr. 363, 401), and 5.0 cm in August 2008. (Tr. 367, 371).[13] Notably, the report of the February 8, 2007, CT scan describes Plaintiff's aortic root as "dilated, measuring 4.8 cm in diameter, *increased slightly in size since the previous study* when it measured about 4.2 cm in diameter." (Tr. 363, 401 (emphasis added). Thus, the medical opinions of Dr. King and Dr. Riess that Plaintiff's aneurysm had increased in size were "well-supported," as required by the regulations. See 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *1.

However, despite acknowledging Dr. King's opinion on this issue, the ALJ nonetheless concluded that "the evidence in the record does not document . . . a progression of the dissection; the evidence, rather, shows the disease to be stable." (Tr. 21). The ALJ cites three sources in the record for his conclusion:

---

The regulations provide that the final responsibility for deciding issues such as these is reserved for the Commissioner. Id.

[13] During the course of her treatment, Plaintiff has undergone CT scans, echocardiograms, MRIs and ultrasound, with the different procedures sometimes showing very different readings. (Compare Tr. 361, 398 (February 8, 2007, echocardiogram measures Plaintiff's aorta at 2.9 cm), with Tr. 363, 401 (on the same day CT scan measures Plaintiff's aorta at 4.8 cm)). The Court finds that the CT scans are the most useful in the present case, for two reasons. First, the evidence in the record indicates that Plaintiff underwent CT scans more consistently than she did other tests, providing measurements on a regular basis from January 2003 to August 2008. (See Medical Evidence in the Record, Part I.C, supra.) Second, consulting cardiac specialist Dr. Mary Boylan, M.D. (Dr. Boylan), opined that CT scans were more reliable than ultrasound; although Dr. Boylan did not directly compare CT scans with echocardiograms or MRIs, she recommended that Plaintiff undergo CT scans for future measurements. (Tr. 415, 490).

(1) the September 17, 2008, notes of a consulting physician, Dr. Mary J. Boylan, M.D.

    (Dr. Boylan), describing Plaintiff's aneurysm as "stable," (Id. (citing Tr. 415, 490));

(2) Dr. King's letter December 9, 2008, letter, (Id. (citing Tr. 477)); and

(3) the report of a CT scan performed September 8, 2009, also describing Plaintiff's

    aneurysm as "stable."  (Id. (citing Tr. 488)).

An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported my medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the record as a whole.  See Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991).  The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence.  See Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).  In other words, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise.  Id.

In the present case, none of these exceptions apply.  The medical opinions of Dr. King and Dr. Riess that Plaintiff's aneurysm had increased in size were not conclusory or unsupported, as they were objectively supported by CT scans that showed her aneurysm increased in size from 4.2 cm after her surgery in January 2003, to 5.0 cm in August 2008.  Nor is the evidence that the ALJ cited "better" or "more thorough" evidence than the opinions of Dr. King and Dr. Riess. The portions of the record relied on by the ALJ to discount the opinions of Plaintiff's treating physicians are themselves unpersuasive.

(1) Dr. Boylan's notes indicate that the only CT scans she reviewed were from February 2007 and August 2008.  (Tr. 415, 480).  Consequently, Dr. Boylan's description of Plaintiff's aneurysm as "stable" is incomplete as it considered only the February 2007 measurement of 4.8 cm (Tr. 363, 401), and the August 2008 measurement of 5.0 cm (Tr. 367, 371).  Dr. Boylan's note fails to consider and take into account the objective enlargement of Plaintiff's aortic aneurysm when compared to earlier CT scans that measured Plaintiff's aneurysm at 4.2 cm in January 2003 (Tr. 265), and 4.0 cm in May 2005.  (Tr. 454).

(2) Dr. King's letter actually acknowledges that Plaintiff's aneurysm increased in size.  (Tr. 477).  The ALJ does not explain why he gives greater weight to the fact that it has not continued to grow than to the initial enlargement.  (Tr. 21).

(3) Although the report from the September 2009 CT scan describes the size of Plaintiff's aorta as "stable," it provides no reference to the actual measurement for comparison to previous CT scans.  (Tr. 488).

The regulations allow that an ALJ may choose not to give controlling weight to a treating physician's opinion; however, he must explain his reasons for doing so:

> When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

20 C.F.R. § 404.1527(c)(2).  Here, the ALJ did not give controlling weight to the treating physicians' opinions, and he did not provide his reasons for doing so.

**D. Whether the ALJ's Decision is Supported by Substantial Evidence on the Record as a Whole, or Instead Shows that Plaintiff Does Meet the Requirements of Listing 4.10.**

Plaintiff argues that substantial evidence on the record as a whole supports a finding that Plaintiff meets the requirements of Listing 4.10. (Pl.'s Mem. Supp. Mot. Summ. J. [Docket No. 7], at 25-26). However, the question before the Court is not whether substantial evidence on the record as a whole supports a finding that Plaintiff meets the requirements of Listing 4.10, but rather whether substantial evidence on the record as a whole supports the ALJ's finding that Plaintiff does not meet the requirements of the listing. Bradley, 528 F.3d at 1115 (Court will not reverse "so long as the ALJ's decision falsl within the 'available zone of choice'"); Robinson, 956 F.2d at 838 ("if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the Court] must affirm the decision").

The ALJ performs a five-step process to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a) through 416.920(a).

In the present case, there is no dispute over the ALJ's finding, at Step 1, that Plaintiff has not engaged in substantial gainful activity since January 2003, when she alleges her disability began. (Tr. 20). There also is no dispute over the ALJ's finding, at Step 2, that since January 2003 Plaintiff has had several "severe impairments," including her aortic dissection. (Tr. 20-21).

The dispute concerns whether there is substantial evidence on the record as a whole to support the ALJ's finding, at Step 3, that Plaintiff's aortic dissection did not meet or medically equal Listing 4.10. In particular, because Plaintiff does not dispute the AJL's findings that "the evidence of record does not document a persistence of chest pain," or that "there is no evidence of compression of one or more of branches of the aorta supplying" vital organs, the dispute concerns whether substantial evidence on the record as a whole supports the ALJ's finding that

Plaintiff's aneurysm has not increased in size.  (Tr. 21).  As the ALJ notes, "[i]f the claimant's impairment . . . meets or medical equals the criteria of a listing and meets the duration requirement, the claimant is disabled."  (Tr. 19 (citation omitted)).

In considering the dispute regarding the ALJ's determination at Step 3, the Court has independently reviewed the entirety of the medical record before it and finds that the ALJ's determination regarding whether Plaintiff's impairment meets Listing 4.10 is not supported by substantial evidence on the record as a whole.

Listing 4.10 includes any "[a]neurysm of the aorta or major branches . . . with dissection not controlled by prescribed treatment."  20 C.F.R. Part 404, Subpart P, App'x 1, Listing 4.10, available at http://www.law.cornell.edu/cfr/text/20/404/subpart-P/appendix-1.  "We consider the dissection not controlled when you have . . . an increase in the size of the aneurysm  . . . ."  20 C.F.R. Part 404, Subpart P, App'x 1, Listing 4.10 (italics in original), available at http://www.law.cornell.edu/cfr/text/20/404/subpart-P/appendix-1.  The question, then, is whether substantial evidence in the record as a whole supports the ALJ's finding that Plaintiff's aortic dissection has not increased in size.

The ALJ's found that "the evidence . . . shows the disease to be stable.  Following Dr. Michael Kings' [sic] December 9, 2009 note regarding enlargement of the dissection, evidence has not shown an increase in the size of the claimant's aneurysm."  (Tr. 21 (citations omitted)).  The ALJ first finds that Plaintiff's aneurysm is "stable," citing Dr. Boylan's notes of September 17, 2008, and the record of a CT scan performed September 8, 2009, both of which describe Plaintiff's aneurysm as "stable."  (Id. (citing Tr. 415, 490; Tr. 488)).  However, as discussed in Part III.C, supra, both Dr. Boylan's notes and the record of the September 8, 2009, CT scan are of limited value, as each reviews only a portion of Plaintiff's medical record.  And neither

addresses the critical inquiry of whether Plaintiff's aortic aneurysm has increased in size. Dr. Boylan wrote that Plaintiff's aneurysm was stable after comparing CT scans taken in February 2007 and August 2008, (Tr. 415, 480), which showed measurements, respectively, of 4.8 cm, (Tr. 363, 401), and 5.0 cm. (Tr. 367, 371). Similarly, the record of the CT scan performed September 8, 2009, does not provide a measurement, but merely reports that the aneurysm is "stable." (Tr. 488). In other words, both records that the ALJ cites to report merely that Plaintiff's aneurysm was "stable" at 4.8 cm to 5.0 cm from February 2007 to September 2009. However, neither of those records compares those measurements with earlier CT scans that objectively showed Plaintiff's aneurysm measured 4.2 cm in January 2003 (Tr. 265), and 4.0 cm in May 2005 (Tr. 454), and thus had objectively increased in size to 5.0 cm by 2009.

In fact, the ALJ seems to acknowledge as much. In explaining his Step 2 finding that Plaintiff had severe impairments, the ALJ wrote: "Dr. Michael King . . . indicated in a December 9, 2008 letter, that the claimant had some concerning with a ***potentially enlarging*** aortic root ***that has increased in size from 4.2 cm to 4.8 cm***." (Tr. 21 (citing Tr. 477) (emphasis added)). Here, the ALJ acknowledges that in fact the aneurysm "has increased in size," and that it might continue to grow. Similarly, in explaining why at Step 3 he found that Plaintiff did not meet the requirements of Listing 4.10, the ALJ described Dr. King's letter as "regarding ***enlargement of the dissection***," but noted only that it had not grown since Dr. King wrote the letter. (Tr. 21). Although the ALJ's finding that Plaintiff's aneurysm has not continued to grow since Dr. King's letter of December 9, 2008, and in fact has remained relatively stable since February 2007, the ALJ ignores the report in Dr. King's letter, substantiated by other objective medical evidence in the record, that Plaintiff's aneurysm grew from 4.2 cm in January 2003 to 4.8 cm in February 2007.

Defendant argues that Dr. King's letter indicates only that Plaintiff's aneurysm was "potentially" increasing in size. (Def.'s Mem. Supp. Mot. Summ. J. [Docket No. 10], at 14 (citing Tr. 477)). This argument is not persuasive, as it ignores Dr. King's documentation in the letter, supported by other objective medical evidence in the record, that Plaintiff's aneurysm *had already increased* from 4.2 cm to 4.8 cm. (Tr. 477; see also Part I.C, supra). Even the ALJ appears to acknowledge that Dr. King's letter documents an actual increase in the size of Plaintiff's aneurysm. (Tr. 21 ("Dr. Michael King . . . indicated in a December 9, 2008 letter that the claimant had some concern with a potentially enlarging aortic root ***that has increased in size from 4.2 to 4.8 cm***") (emphasis added)).

Defendant further argues that "while some tests showed an increase in the size of Plaintiff's aneurysm, other tests show that her aneurysm not only stayed the same size, but often decreased in size." (Def.'s Mem. Supp. Mot. Summ. J. [Docket No. 10], at 13 (comparing Tr. 375 (September 3, 2008, ultrasound showed aortic measurement of 3.2 cm), with Tr. 481 (April 28, 2009, ultrasound showed aortic measurement of 2.7 cm))). This argument also fails to persuade the Court, for two reasons. First, the report from the September 3, 2008, ultrasound indicates an increase in the size of Plaintiff's aneurysm, although it does not note the source of comparison or the size of any previous measurement. (Tr. 375 ("Increasing diameter of the aorta, presently measuring 3.2 centimeters in diameter. The dissection is not visible by ultrasound but is confirmed by CT.")). Second, as previously noted, cardiac specialist Dr. Boylan expressly stated that ultrasound was an inferior diagnostic test and advised Plaintiff to get regular CT scans. (Tr. 415, 490 (describing ultrasound as "not an adequate test" and "inferior" to CT scans)). The fact that the medical record contains reports from an "inferior" test that show a reduction in the size of Plaintiff's aneurysm is not sufficient to outweigh the objective records

of the medically preferred CT scans that show an increase from 4.2 cm in 2003, to 4.8 cm. in 2007, then plateauing at 4.8 to 5.0 cm by 2009. See also fn.13, supra (explaining why the Court finds the CT scans to be the most reliable measurements in the record).

Defendant also argues that doctors described the increase from 4.2 cm to 4.8 cm as merely "slight." (Def.'s Mem. Supp. Mot. Summ. J. [Docket No. 10], at 13 (citing Tr. 362, 364-65, 479)). Although Defendant's observation is accurate, Plaintiff cites no authority, and this Court has found no authority, for the proposition that a "slight" increase in size does not satisfy the 4.00H6 requirement that "the dissection [is] not controlled when you have . . . an increase in the size of the aneurysm."[14]

Finally, Defendant argues that "[e]ven Dr. King, on whom Plaintiff so heavily relies, . . . did not believe surgery should be considered unless and until Plaintiff's aortic diameter exceeded 5.5 cm." (Def.'s Mem. Supp. Mot. Summ. J. [Docket No. 10], at 14 (citing Tr. 477)). This is a *non sequitur*. Listing 4.10 and 4.00H6 do not ask whether a claimant's condition requires surgery; they ask simply whether the dissection is controlled, and state that an increase in size shows that the condition is not controlled.

As explained in Part III.A, supra, the ALJ's statement that Plaintiff's aneurysm has not increased in size since Dr. King's letter misstates the applicable standard. The ALJ found, at Step 2, that Plaintiff had a severe impairment, namely aortic dissection, as of January 22, 2003. (Tr. 20-21). Listing 4.10 and 4.00H6 indicate that a disability exists when an aortic dissection increases in size. Substantial evidence on the record as a whole demonstrates that Plaintiff's

---

[14] Defendant also argues that "in June 2004, an MRI showed no evidence of aneurysm at all." (Def.'s Mem. Supp. Mot. Summ. J. [Docket No. 10], at 13 (citing Tr. 411)). The record to which Plaintiff refers is a brain MRI, not a chest or abdominal MRI. (Tr. 411). Thus, the fact that the MRI found "no record of aneurysm" sheds no light on the condition of Plaintiff's aortic aneurysm.

aortic dissection increased in size from 4.2 cm in January 2003, (Tr. 265), to 4.8 cm in February 2007, (Tr. 363, 401), to 5.0 cm in August 2008.  (Tr. 367, 371).[15]

The only remaining question, then, is whether Plaintiff's impairment met the duration requirement.  (Tr. 19).  Federal regulations specify that a claimant's impairment "must have lasted or must be expected to last for a continuous period of at least 12 months."  20 C.F.R. § 404.1509 and 20 C.F.R. § 416.909.  The Court finds that this requirement was met.  Defendant first underwent a CT scan that showed an increase in the size of aneurysm, from 4.2 cm to 4.8 cm, on February 7, 2008.  (Tr. 363, 401).  Since that date, CT scans have consistently found Plaintiff's aneurysm to be enlarged when compared to the January 2003 baseline reading of 4.2 cm.  (See, e.g., Tr. 367, 371 (CT scan showed measurement of 5.0 cm in August 2008); Tr. 481, 500 (CT scan showed dissection "unchanged" since August 2008)).  More important, there is no equally credible evidence in the record that would contradict a finding that Plaintiff's aortic dissection increased in size in February 2007, and remained at that size for more than 12 months, thus satisfying the duration requirement.

The Court finds that substantial evidence on the record on the whole <u>does not</u> support the ALJ's determination at Step 3 that Plaintiff did not meet the requirements of Listing 4.10.  The Court further finds that substantial evidence on the record as a whole <u>does</u> support a finding that Plaintiff met Listing 4.10 and satisfied the duration requirement.


IV.     **CONCLUSION**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

---

[15] Even the first state agency reviewer Michael Schultz observed that the record showed "dilation of aortic root 5.0 cm."  (Tr. 426).

1. Plaintiff's Motion for Summary Judgment [Docket No. 6] be **GRANTED**; and

2. Defendants' Motion for Summary Judgment [Docket No. 9] be **DENIED**; and

3. The decision of the ALJ be REVERSED and remanded for entry of judgment consistent with this Report and Recommendation.

Dated: February 1, 2013                                    s/Leo I. Brisbois
                                                           LEO I. BRISBOIS
                                                           United States Magistrate Judge

## N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by February 15, 2013**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.